1

2

3

4

5

6

7



**FILED**

JUN 27 2014

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

8

9

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

| | |
|---|---|
| ROBERTO BELTON, | No. C 12-03582 BLF (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| WILLIAM KNIPP, Warden, | |
| Respondent. | |

17

18

19

20

21

22

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1] The Court ordered Respondent to show cause why the petition should not be granted. Respondent has filed an answer addressing the merits of the petition. Petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and denies the petition.

23

24

**PROCEDURAL HISTORY**

25

26

Petitioner was sentenced to seventy-one years-to-life in state prison in Alameda County Superior Court, after his conviction for two counts of robbery with an

27

28

---

[1] This matter was reassigned to this Court on April 17, 2014.

1  enhancement on both counts for personal use of a firearm, and one count of being a felon

2  in possession of a firearm.   Petitioner also admitted two "strike" prior convictions and

3  one prior prison term.

4          Petitioner filed a direct appeal to the California Court of Appeal, which affirmed

5  the conviction and judgment.  The California Supreme Court denied review.  Petitioner

6  filed the instant federal habeas petition on July 9, 2012.

7

8                              **BACKGROUND**[2]

9          On January 15, 2006, James Joseph and Joga Singh were working
   at a Union City liquor store when two men wearing masks entered the
10  store.  One of the masked men was armed with a silver-colored handgun
   and wore gloves.  The other masked man appeared to be unarmed.  While
11  the armed man pointed the gun at Joseph, the other man ordered Joseph to
   lie down on the floor.  Joseph complied.  The armed man then pointed the
12  gun at Singh's chest and told him to open the register drawer.  After Singh
   opened the register, the armed man jumped over the counter toward Singh
13  while his cohort removed between $300 to $400 from the register.

14          After the cash had been removed from the register, the man with
   the gun instructed Singh to open the safe.  Singh was about to open a box
15  that contained additional cash when he heard a gun go off.  The armed
   man, who seemed to be panicking, said he had shot himself in the foot.
16  The two masked men then left the store.

17          There was a trail of blood leading out of the store as well as blood
   in the area where the armed man had been standing.  After the police
18  arrived at the scene, officers followed the blood trail to an apartment
   complex located behind the liquor store.  The officers on the scene were
19  then advised that a male patient had been admitted at Highland Hospital
   with a gunshot wound to his foot.  An officer made arrangements to have
20  a search warrant prepared for the apartment to which the blood trail led,
   ensured that the apartment was under surveillance, and traveled to
21  Highland Hospital to interview the gunshot victim, who was identified as
   appellant Roberto Belton.  Belton had suffered a "clean through-and-
22  through shot" to his foot.  At the hospital, the officer collected Belton's
   shoes and clothes and booked them into evidence.  The officer returned to
23  the crime scene, reviewed surveillance video of the robbery, and later
   retrieved a copy of the surveillance video.

24          Police searched the apartment that had the blood trail leading to its
25  front door.  It appeared as though someone had tried to clean up the blood
   outside the apartment.  Inside the apartment door there was a small
26

27     [2]The facts of this case are taken from the California Court of Appeal opinion in
28  *People v. Belton*, No. A125320 (Cal. App. 1 Dist. Jun. 29, 2011).  (Ans. Ex. E ("Op").)

amount of blood.

Belton was arrested upon being released from the hospital. A DNA sample obtained from Belton matched the DNA profile associated with samples taken from the blood evidence at the crime scene.

On April 9, 2007, the Alameda County District Attorney filed a three-count information charging Belton with two counts of second degree robbery (Pen. Code, [FN1] § 211) and one count of being a felon in possession of a firearm (§ 12021, subd. (a)(1)). It was alleged as to each of the two robbery counts that Belton had personally used a firearm during the commission of the offense. (§§ 12022.5, subd. (a), 12022.53, subd. (b).) The district attorney also alleged that Belton had suffered two prior "strike" convictions (§§ 667, subd. (e)(2)(A), 1170.12, subd. (c)(2)(A)) and had served a prior prison term within the meaning of section 667.5, subdivision (b).

> FN1. All further statutory references are to the Penal Code unless otherwise specified.

The matter was tried before a jury. Belton was defended at trial by counsel he had retained. The defense did not call any witnesses and Belton did not testify. The parties stipulated that Belton was a convicted felon and that the blood found at the crime scene was his. Belton's retained counsel did not dispute that his client was present at the robbery and used a gun. Instead, the defense focused on surveillance video purportedly showing that Belton had "braced" himself before shooting his foot. Belton's retained counsel sought a jury instruction on the affirmative defense of duress, contending that Belton's apparent act of bracing himself before shooting his foot – suggesting he shot himself intentionally – permitted a good faith argument that Belton committed the offense because of a reasonable belief that his or someone else's life was in immediate danger if he refused to participate in the robbery. The trial court rejected the requested jury instruction on duress, reasoning that "there's not a scintilla of evidence in the record to suggest that this defendant was acting anything other than voluntarily and willfully and knowingly and intentionally and without duress in committing... these offenses."

In his closing argument, Belton's retained counsel contended that the evidence of a bracing action showed Belton "knew that he was going to shoot himself in the foot." He further argued that the bracing action supported inferences that Belton shot himself on purpose and did not "intend to be there.... [or] rob anybody." Although Belton's retained counsel did not argue the affirmative defense of duress, he nonetheless urged there was reasonable doubt as to whether his client possessed the intent to rob or deprive anyone of property.

The jury took less than two hours to reach a verdict. It found Belton guilty of the robbery charges as well as the charge of possession of a firearm by a felon, and it also found true the allegations that Belton personally used a firearm during the commission of the robberies. Belton waived his right to a jury trial on the prior conviction allegations and admitted he had suffered two prior strikes and had failed to remain free of prison custody for five years before committing the offenses of which he

1   was convicted.

2          Before sentencing, the court allowed Belton's retained counsel to
    withdraw in light of a declared conflict with his client. The court then
3   appointed the public defender's office to represent Belton. After the
    public defender sough reconsideration of the order allowing retained
4   counsel to withdraw, the court confirmed its order after holding a sealed
    hearing involving Belton and his retained counsel. Belton's appointed
5   counsel from the public defender's office thereafter moved for a new trial
    on the ground that his retained trial attorney provided constitutionally
6   ineffective assistance of counsel. [FN2] Belton claimed his retained
    counsel's performance was deficient in that counsel advised him not to
7   testify, even though there was no evidence to support a duress defense
    without Belton's testimony. Belton also claimed his retained counsel had
8   been ineffective in failing to give him competent advice that would have
    allowed him to intelligently decide whether to accept a plea offer of a 25-
9   year determinate sentence instead of proceeding to trial. The court denied
    the new trial motion.

10
           FN2. To avoid confusion, where the context requires identification
11         of the particular attorney who represented Belton in the trial [], we
           will refer to the attorney who represented him through the
12         conclusion of the jury trial as his retained counsel or attorney, and
           we will refer to the public defender who represented Belton
13         following withdrawal of his retained attorney as Belton's appointed
           counsel or attorney.
14

15   (Op. at 1-4.)

16

17                              **DISCUSSION**

    A.    **Standard of Review**
18
           This Court may entertain a petition for writ of habeas corpus "in behalf of a person
19
    in custody pursuant to the judgment of a state court only on the ground that he is in
20
    custody in violation of the Constitution or laws or treaties of the United States." 28
21
    U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996
22
    ("AEDPA"), a district court may not grant a petition challenging a state conviction or
23
    sentence on the basis of a claim that was reviewed on the merits in state court unless the
24
    state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or
25
    involved an unreasonable application of, clearly established federal law, as determined by
26
    the Supreme Court of the United States; or (2) resulted in a decision that was based on an
27
    unreasonable determination of the facts in light of the evidence presented in the state
28

1  court proceeding." 28 U.S.C. § 2254(d).   The first prong applies both to questions of law
2  and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000),
3  while the second prong applies to decisions based on factual determinations, *Miller-El v.*
4  *Cockrell*, 537 U.S. 322, 340 (2003).

5        "Under the 'contrary to' clause, a federal habeas court may grant the writ if the
6  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
7  question of law or if the state court decides a case differently than [the] Court has on a set
8  of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  A state court
9  decision is an "unreasonable application of" Supreme Court authority, falling under the
10 second clause of § 2254(d)(1), if the state court correctly identifies the governing legal
11 principle from the Supreme Court's decisions but "unreasonably applies that principle to
12 the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not
13 issue the writ "simply because that court concludes in its independent judgment that the
14 relevant state-court decision applied clearly established federal law erroneously or
15 incorrectly." *Id.* at 411.

16       In determining whether the state court's decision is contrary to, or involved an
17 unreasonable application of, clearly established federal law, a federal court looks to the
18 decision of the highest state court to address the merits of a Petitioner's claim in a
19 reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Here,
20 that decision is the opinion of the California Court of Appeal.

21 B.   **Legal Claims and Analysis**

22       Petitioner raises two ineffective assistance of counsel claims as grounds for federal
23 habeas relief: (1) trial counsel failed to proffer a duress defense after conceding
24 Petitioner's participation in the underlying robbery, and (2) trial counsel failed to properly
25 advise Petitioner regarding a plea offer of 25 years.

26       In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,
27 Petitioner must establish two things.  First, he must establish that counsel's performance
28 was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under

1   prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).

2   Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*,

3   that "there is a reasonable probability that, but for counsel's unprofessional errors, the

4   result of the proceeding would have been different." *Id.* at 694.  A reasonable probability

5   is a probability sufficient to undermine confidence in the outcome. *Ibid.*  A court need

6   not determine whether counsel's performance was deficient if the lack of prejudice is

7   clear. *Id.* at 697.

8          The *Strickland* framework for analyzing ineffective assistance of counsel claims is

9   considered to be "clearly established Federal law, as determined by the Supreme Court of

10  the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v.*

11  *Pinholster*, 131 S. Ct. 1388, 1403 (2011).  On federal habeas, a petitioner must show that

12  the state court applied *Strickland* to the facts of his case in an objectively unreasonable

13  manner. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam).  A "doubly"

14  deferential judicial review is appropriate in analyzing ineffective assistance of counsel

15  claims under § 2254. *See Pinholster*, 131 S. Ct. at 1410-11; *Harrington v. Richter*, 131 S.

16  Ct. 770, 788 (2011) (same); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011) (same).  The

17  general rule of *Strickland*, *i.e.*, to review a defense counsel's effectiveness with great

18  deference, gives the state courts greater leeway in reasonably applying that rule, which in

19  turn "translates to a narrower range of decisions that are objectively unreasonable under

20  AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough*

21  *v. Alvarado*, 541 U.S. 652, 664 (2004)).  When § 2254(d) applies, "the question is not

22  whether counsel's actions were reasonable.  The question is whether there is any

23  reasonable argument that counsel satisfied *Strickland*'s deferential standard."

24  *Harrington*, 131 S. Ct. at 788.

25          1.    **Failure to Proffer Duress Defense**

26          The California Court of Appeal summarized this claim and rejected it on the

27  merits:

28          Belton contends the trial court erred in denying his motion for a

new trial. He asserts that his retained counsel's failure to put on a duress defense after conceding his participation in the robbery amounted to constitutionally ineffective assistance of counsel. As explained below, we conclude Belton suffered no prejudice as a result of his retained counsel's purportedly deficient performance because there is no reasonable probability the result would have been any different if Belton had testified that he acted under duress.

## A. *Factual Background*

When the court was considering motions in limine, Belton's retained counsel mentioned that his client sought to establish a duress defense, which would be incomplete without Belton's own testimony. Retained counsel argued that Belton would be prejudiced by the introduction of evidence concerning Belton's prior robberies, which counsel stated were "substantially similar" to the charged offenses. [FN3] The court ultimately ruled that the facts of three armed robberies Belton had committed in 2002 would be admitted on the issue of intent if Belton were to testify he had committed the charged robbery offenses while under duress. The prosecutor agreed not to mention any of the prior robberies unless Belton opened the door by presenting a duress defense.

> FN3. Belton had been convicted of robberies committed in 2002 and 2005. Although he had been charged with committing three armed robberies in 2002, he was only convicted of one of the charged robberies pursuant to a negotiated disposition.

Belton did not testify at trial or call any witnesses on his behalf. His defense turned on surveillance video purportedly showing that he braced himself before firing the gun. Retained counsel sought an instruction on duress, arguing that the evidence suggesting Belton intentionally shot himself allowed him to make a good faith argument that Belton acted under duress. The trial court rejected the instruction, explaining that there was no evidentiary support for the defense. In closing argument, retained counsel urged that the bracing action and the inferences to be drawn from it created reasonable doubt as to whether Belton intended to rob the liquor store.

Following the jury's verdict, Belton sought to fire his retained counsel, who moved to withdraw after declaring a conflict with his client. During the course of a sealed hearing to consider whether to allow retained counsel to withdraw, Belton expressed his dissatisfaction with his attorney. Among other things, Belton said his wife wanted to hire a private attorney to represent him at trial because he was facing his third strike. He stated that his retained counsel did not defend him at all and that he did not have an opportunity to tell his side of the story. He claimed he was told he would testify but that "never happened." Belton's retained counsel responded that issues relating to the duress defense were litigated at length during in limine motions. He hoped an appellate lawyer would be able to get a new trial in which Belton's prior convictions would be excluded from evidence were he to testify.

Belton explained during subsequent proceedings that his retained counsel told him his testimony would be the "main thing in [his] defense." Belton wanted to testify and expected to do so. The strategy changed

when the court allowed Belton to be impeached with his prior convictions. At that point, retained counsel told Belton he would not testify. Belton clarified that he never insisted on testifying and never made his desire to testify known to the trial judge. Retained counsel explained that he was unable to locate certain witnesses that Belton claimed would aid in his defense, and a witness the defense had under subpoena could not corroborate Belton's story.

The trial court allowed retained counsel to withdraw and appointed counsel from the public defender's office to represent Belton in further proceedings. Appointed counsel thereafter filed a motion for new trial on the ground that Belton's retained counsel provided constitutionally ineffective assistance of counsel at trial. In the motion, appointed counsel argued that retained counsel's advice to Belton not to testify constituted deficient performance. Given the lack of evidence supporting a duress defense in the prosecution case, and in light of retained counsel's concession during opening statements that Belton had robbed the liquor store, appointed counsel contended the only reasonable course of action was to call Belton to testify. According to appointed counsel, failing to call Belton to testify assured a guilty verdict in a three strikes case. Further, to the extent retained counsel hoped to mount an appellate attack on the court's evidentiary ruling concerning impeachment with prior crimes, retained counsel failed to preserve the issue for appeal. Appointed counsel pointed out that a defendant must actually take the stand and suffer impeachment with prior convictions if he seeks to preserve the issue for appeal.

In support of the motion, appointed counsel submitted a declaration stating that Belton had consistently told retained counsel that he committed the robbery because he believed his girlfriend and his mother would otherwise be "subjected to harm in the future." Further, according to the declaration, Belton never told retained counsel that he committed the robbery because "he himself would suffer immediate harm if he refused to commit the robbery."

Belton testified during a hearing on his new trial motion and further explained the purported factual support for his duress claim. He admitted going to the liquor store to rob it. However, he claimed to be concerned about possible future harm to him or his family if he did not rob the liquor store. He explained that on the day of the robbery he was given a gold chain by Jonathan Damon, whom he described as a friend. Damon and Belton had gotten the chain from Damon's cousin, Jaden. While Damon and Belton were at restaurant, a man named Cedric asked Belton to step outside. Cedric claimed the chain was his and asked Belton to return it. Belton did so.

Damon and Belton made their way back to Jaden's house, where Damon retrieved a bag that Belton believed contained a gun. They then drove to the apartment of Damon's girlfriend, Billie Crawford. The apartment was located in Union City near a liquor store. While Belton was in the parking lot of Crawford's apartment house, a man known to him as Brooke approached him. Brooke was a friend or relative of Jaden's and told Belton that he needed to pay Jaden back for the chain he had given to Cedric. Belton testified that he did not want a problem and offered to pay for the chain. He claimed to have money in his bank

account but said he did not yet have an ATM card. Belton offered to borrow money from a friend that owned a liquor store in Oakland. Brooke "kind of flipped out" and thought Belton was trying to "play" him. Brooke suggested they go around the corner and "hit the liquor store." After Belton said he was not "cool" with robbing the liquor store, Brooke said, "first of all... we know where your wife stays. And second of all, you know, we probably already know where your mom stays if you can't find out." Brooke then pulled out a gun and "started looking around like he was about to do something with it right there." Belton "didn't like the way [Brooke] was looking around waiting for the right opportunity when maybe somebody was not looking so he can shoot me."

When Belton was asked what he thought might happen if he did not participate in the robbery, he responded that it was a possibility Brooke or his associates could "leave a message" by shooting at his wife's house. He was concerned that they could have accidentally killed someone by shooting at the house. He was not sure if they knew where his mother lived, but he knew that "people get shot over there all the time." He believed "someone can make a phone call and have stuff like that done."

Belton decided to commit the robbery because "[i]t was easier to pay him." He did not want to commit the robbery but he could not "imagine if something was to happen to [his wife]." He felt his mother was "more safe" but still thought it was "a possibility" that she could be targeted.

Belton was given a mask, latex gloves, and a gun by Damon and Brooke. Belton did not protest being given the gun and did not turn it on Brooke, although he "thought about it." He did not know whether the gun was loaded. At the time Belton was given the gun, Damon was "very far away," in the apartment building's parking lot. Belton believed Damon had a gun available to him. Brooke gave Belton the gun because Belton knew "what to do" and had "done this before."

Brooke entered the liquor store with Belton. During the course of the robbery, Belton shot himself accidentally. He claimed his retained counsel tried to get him to "lie about too many different things," including whether he had shot himself on purpose. [FN4]

FN4. According to the probation report, Belton told the probation officer that "he intentionally shot himself in the foot, because he was not thinking clearly, panicked, and that was the first thing that came to mind." At the sentencing hearing, Belton's appointed counsel attempted to explain the apparent inconsistency in Belton's story, stating that Belton's retained counsel had told Belton it would be best to take the position that he intentionally shot himself.

After he shot himself, Belton went back to Crawford's apartment. Damon drove him to the hospital. While at the hospital, Belton spoke to a police officer and told an elaborate story about being shot during an attempted robbery in Oakland.

Following argument by counsel on the new trial motion, the trial court denied the motion. With regard to the failure to testify, the court

1   stated that the "real question and the controlling issue is whether the
2   outcome of the trial would have been different had [Belton] been given
    the opportunity to get on the stand and testify, essentially, the way he
3   testified... last week during these proceedings." The court concluded it
    was not "reasonably probably that the jury would not have convicted
4   [Belton] had he gotten the opportunity to testify." The court stated Belton
    had "serious credibility problems" that would have been compounded by
5   the facts of his prior robbery convictions coming into evidence. At the
    conclusion of the sentencing hearing, the trial court mentioned that it
6   forgot to inform the parties at the hearing on the new trial motion that it
    intended to refer the matter of retained counsel's representation of Belton
7   to the State Bar for investigation. The court clarified that it continue[d] to
    believe that there was no showing of prejudice such that a new trial would
8   be warranted."

9           **B.      *Standard of Review***

10          Section 1181 specified the statutory grounds on which a defendant
    may seek a new trial following a conviction. Although ineffective
11  assistance of counsel is not one of the statutory grounds for seeking a new
    trial, the issue may nonetheless serve as the basis for nonstatutory motion
12  for a new trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583;
    *People v. Reed* (2002) 183 Cal.App.4th 1137, 1143; *People v. Andrade*
13  (2000) 79 Cal.App.4th 651, 659.)

14          The appellate standard of review regarding a motion for new trial
    depends on the procedural posture of the motion. (*Whitlock v. Foster
15  Wheeler, LLC* (2008) 160 Cal.App.4th 149, 158.) We review an order
    granting a new trial motion for abuse of discretion. (*People v. Albarran*
16  (2007) 149 Cal.App.4th 214, 224-225, fn. 7.) In addition, a trial court
    order denying a statutory new trial motion is generally reviewed for
17  manifest abuse of discretion. (See *People v. Delgado* (1993) 5 Cal.4th
    312, 328.) However, when a motion for a new trial is based on a
18  nonstatutory ground, such as ineffective assistance of counsel, "the proper
    scope of review of the trial court's ruling... based upon an allegation of
19  denial of constitutional rights is not so simple." (*People v. Taylor* (1984)
    162 Cal.App.3d 720, 724.) In such circumstances, rather than applying an
20  abuse of discretion standard, we defer to the trial court's factual findings
    if supported by substantial evidence, but we exercise de novo review as to
21  the ultimate issue whether the defendant's constitutional rights were
    violated. (*Id.* at pp. 724-725; see also *People v. Dykes* (2009) 46 Cal.4th
22  731, 809 [discussing standard applicable to review of order denying new
    trial motion based on juror misconduct].)

23          In order to prevail on a claim of ineffective assistance, a defendant
    must show that "counsel's representation fell below an objective standard
24  of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.)
    A defendant must also demonstrate there is "a reasonable probability that,
25  but for counsel's unprofessional errors, the result of the proceeding would
    have been different." (*Id.* at 694.) "A reasonable probability is a
26  probability sufficient to undermine confidence in the outcome." (*Ibid.*)
    "Failure to make the required showing of either deficient performance or
27  sufficient prejudice defeats the ineffectiveness claim." (*Id.* at p. 700; see
    also *People v. Hester* (2000) 22 Cal.4th 290, 296; *People v. Andrade,
28  supra,* 79 Cal.App.4th at pp. 659-660.)

1

C.   *Analysis*

2      Belton argues that his retained counsel provided ineffective
assistance of counsel by failing to put on a duress defense. Although he

3   acknowledges he would have been impeached with his prior convictions if
he testified, he nonetheless argues that the alternative was to be left

4   without any defense. The People disagree, asserting that Belton's retained
counsel made a tactical and informed decision not to put his client on the

5   stand in view of the impeachment he would suffer if he were to testify.
Further, the People contend that counsel could not be ineffective for

6   failing to put on an unmeritorious duress defense.

7      In this case, we need not resolve the issue of whether retained
counsel's performance at trial was deficient because we conclude, as did

8   the trial court, that Belton has failed to establish he suffered prejudice as a
result of his attorney's alleged deficient performance. (See *Strickland v.*

9   *Washington, supra,* 466 U.S. at p. 697 [if it is easier to dispose of
ineffectiveness claim on ground of lack of prejudice, court need not

10  address performance prong of analysis].) As we explain, Belton has not
demonstrated a reasonable probability that the result of the trial would

11  have been different but for his retained counsel's purportedly
unprofessional decision to recommend that he not testify.

12

13     Duress is a defense available to defendants who commit a crime
other than murder "under threats or menaces sufficient to show that they

14  had reasonable cause to and did believe their lives would be endangered if
they refused." (§ 26, subd. 6; *People v. Vieira* (2005) 35 Cal.4th 264,

15  289-290.) The defense may also apply when a defendant commits a crime
in order to prevent imminent harm to a third person. (*People v. Pena*

16  (1983) 149 Cal.App.3d Supp. 14, 23-25; cf. *People v. Coffman and
Marlow* (2004) 34 Cal.4th 1, 100 [duress instruction properly rejected

17  because threat to defendant's child not shown to be immediate].)

18     In order to establish a valid duress defense, a defendant must show
that "he acted under an immediate threat or menace. [Citation.]" (*People*

19  *v. Petznick* (2003) 114 Cal.App.4th 663, 676.) "Because of the
immediacy requirement, a person committing a crime under duress has

20  only the choice of imminent death or executing the requested crime. The
person being threatened has no time to formulate what is a reasonable and

21  viable course of conduct nor to formulate criminal intent. The unlawful
acts of the person under duress are attributed to the coercing party who

22  supplies the requisite mens rea and is liable for the crime. [Citation.]"
(*People v. Condley* (1977) 69 Cal.App.3d 999, 1012.) "Decisions

23  upholding the duress defense have uniformly involved '"a present and
active aggressor threatening immediate danger."' [Citation.] A

24  'phantasmagoria of future harm' such as a threat of death to be carried out
at some undefined time, will not diminish criminal culpability. [Citation.]"

25  (*People v. Petznick, supra,* at pp. 676-677.) An honest but unreasonable
belief that one is under an immediate threat or menace does not support a

26  duress defense. (See *People v. Anderson* (1991) 233 Cal.App.3d 1646,
1663-1664 [no defense of "imperfect duress"]; *People v. Jacobs* (1991)

27  230 Cal.App.3d 1337, 1341-1345.)

28     Belton did not have a viable duress defense even if you credit the
testimony he gave at the hearing on the new trial motion. There was no

immediate threat to his wife, his wife's family, or his mother that required him to act without the opportunity to formulate a viable course of conduct. At most, he claimed a "possibility" that his mother might be targeted or that the person who was allegedly threatening him could arrange to have someone shoot at his wife's house. (Cf. *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 100 [duress instruction rejected where threats to defendant's child, who was living in another state, not shown to be immediate].)

Belton also failed to establish he was in imminent danger of death or great bodily injury. Although Brooke brandished a gun, he never explicitly threatened Belton. Indeed, Brooke tried to calm Belton and reassure him that everything would be all right. Further, Brooke's subsequent conduct vitiated any such claim when he gave Belton the loaded gun to commit the robbery. There was absolutely no evidence that Brooke had a gun during the robbery. Jonathan Damon, the only other person Belton believed had access to a gun, was far away at the time of the robbery. At the point that he was handed the gun, there was nothing to preclude Belton from turning the gun on the unarmed Brooke and foiling the robbery by calling the police. Belton's own testimony negated the imminent harm component of the duress defense. (See *People v. Heath* (1989) 207 Cal.App.3d 892, 902 [defendant's testimony that he left presence of armed aggressor to commit burglary negated duress defense].)

The weakness of Belton's purported duress defense is highlighted by statements his appointed counsel made to the trial court in connection with the new trial motion. In a declaration, appointed counsel stated that Belton had consistently told his retained counsel that his wife and mother would be subjected to harm in the *future* if he failed to carry out the robbery. In addition, appointed counsel stated Belton never told his retained counsel that he himself would suffer immediate harm if he refused to participate in the robbery. In the trial court brief, appointed counsel argued that Belton "does not assert duress," citing the statement that his wife and mother were threatened with future harm. Instead, according to appointed counsel, the proper defense was one of necessity.

Appointed counsel's observations are consistent with the testimony offered by Belton – there was no imminent threat of harm to either Belton or his family that would support a duress defense. Although his appointed counsel argued below that Belton had a viable necessity defense, Belton has not raised the issue on appeal. To avoid any suggestion that Belton's appellate counsel was ineffective for failing to argue that Belton had a valid necessity defense, we shall clarify that the defense was not available to him.

Necessity and duress are distinct defenses. (*People v. Heath*, *supra*, 207 Cal.App.3d at pp. 899-900.) Duress requires an imminent danger and negates the intent element of the crime. (*Id.* at p. 900.) By contrast, necessity "is founded upon public policy and provides a justification [for the crime] distinct from the elements required to prove the crime. [Citation.]" (*Id.* at pp. 900-901.) "The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged. [Citation.]" (*Id.* at p. 901.) "Unlike duress, the threatened harm is in the immediate future, which contemplates the defendant having time

to balance alternative courses of conduct. [Citation.]" (*Ibid.*) "To justify an instruction on the defense of necessity, a defendant must present evidence sufficient to establish that she violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which she did not substantially contribute to the emergency. [Citations.]" (*People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135.)

In this case, a necessity defense would not have been viable. Belton had a "reasonable legal alternative" because he could have summoned help or retreated after he was handed a loaded gun and his aggressor was left unarmed. In addition, committing an armed robbery created a greater danger than the speculative threats of future harm to Belton's wife and mother. In *People v. Kearns*, the court addressed whether a necessity defense was available to a defendant who committed armed robberies because she faced a threat of being killed at some future time if she refused. (*People v. Kearns, supra*, 55 Cal.App.4th at pp. 1133, 1135.) The court held the necessity defense was unavailable because the risk of serious bodily injury or death inherent in an armed robbery is a greater evil than the future, necessarily speculative threat to life that one may seek to preempt by committing a robbery. (*Id.* at p. 1135.)

We conclude Belton did not have a viable duress or necessity defense. Our conclusion is bolstered by the trial court's conclusion that Belton was not credible and his story would have been called into question when he was impeached with his prior robberies. (See *People v. Gamache* (2010) 48 Cal.4th 347, 396 [although we independently review denial of new trial motions, we accept trial court's credibility determinations if supported by substantial evidence].) In assessing Belton's defense, the trial court stated, "He plays the court system and tells whatever story he needs to tell at the time." The court's assessment is supported by substantial evidence in the record. Among other thing[s], it is hard to reconcile Belton's duress claim with the fact that the supposed aggressors handed him a mask, gloves, and a gun before committing the robbery.

Under the circumstances, Belton has not established a reasonable probability that the outcome would have been any more favorable if he had been allowed to testify and present his purported duress defense. Even if his claims were accepted as true by a jury, they still would not have supported a duress defense.

(Op. at 5-15.)

Applying the "doubly" deferential standard of review to this claim under § 2254, this Court cannot conclude that the state court unreasonably applied *Strickland* in rejecting this claim. The record shows that during in limine motions, retained counsel did in fact proffer a duress defense that would involve Petitioner testifying at trial. See *supra*

1    at 7.  However, he had to make a tactical decision to not have Petitioner testify when the

2    trial court ruled that Petitioner's prior robberies would be admitted on the issue of intent

3    if Petitioner testified that he committed the robberies under duress.  *Ibid.*  It was not

4    objectively unreasonable for counsel to decide that the admission of these prior robberies,

5    which he knew to be "'substantially similar'" to the charged offenses, would outweigh

6    any benefit from Petitioner's testimony, *ibid.*; rather, it was more likely to cause greater

7    harm.  Furthermore, even without Petitioner's testimony, counsel tried to raise the

8    inference of duress by arguing that the surveillance video showed Petitioner "bracing"

9    when he shot himself in the foot, indicating he did not intend to commit the robbery.

10   *Ibid.*  Accordingly, it cannot be said that retained counsel performed deficiently in making

11   reasonable tactical decisions with respect to Petitioner's duress defense.

12           Petitioner's main issue is that counsel did not have him testify at trial and give him

13   an opportunity to give his side of the story.  Assuming that counsel's performance in this

14   regard was deficient, Petitioner fails to show that he was prejudiced.  The trial court

15   denied Petitioner's motion for a new trial based on its assessment that Petitioner's

16   testimony was not credible and therefore not likely to have yielded a different outcome:

17           I have to say that I do not believe that it is reasonably probable that
        the jury would not have convicted the defendant had he gotten the
18      opportunity to testify.  There were some serious credibility problems with
        the defendant's testimony and with the way his story came in.  I believe –
19      I don't believe the jury, particularly when they consider his priors, that
        they would have reached a different result.... 
20

21           ...[E]ven when he is not under duress, as he claims, he lets the
        other guy get in the car with a loaded assault weapon, a loaded weapon
22      and a bag.  He says he knows, he knows he's not supposed to be around
        anybody with any loaded weapons.  Instead of pulling over the side, not
23      letting the guy get into his car or pulling over to the side and put him out
        of the car, he was driving around with a loaded weapon in his car.
24      Nothing about being under duress when that happens, none of those kind
        of things.

25           ...[J]ust this whole story.  The DA says, "How did you get the
        gloves?" He has an answer for everything.  "They handed me the gloves
26      on the way into the store" and everything.  He switched back and forth in
        terms of whether the knew the gun was loaded or didn't know the gun was
27      loaded.  He intentionally shot himself.  Then he didn't.... He plays the
        court system and tells whatever story he needs to tell at the time.  When he
28      thinks they are going to get him, when he was apprehended, he got shot in

1   Oakland. He doesn't say anything about the duress of anything. There is
2   always an excuse.

3   (Ans. Ex. B, Reporter's Transcript at 731, 743-744.)

4          The state appellate court was not unreasonable on accepting this assessment which
5   was "supported by substantial evidence in the record." *See supra* at 13. As the trial court
6   pointed out, the several inconsistencies in Petitioner's testimony and his robbery priors
7   raised credibility issues that made it unlikely that a jury would believe his version of
8   events. Furthermore, even if the jury believed him, the state appellate court found that
9   Petitioner's asserted facts did not support a duress defense under California law: (1) there
10  was no immediate threat to Petitioner's wife or any member of his family, and the mere
11  possibility of future harm is not sufficient; and (2) Petitioner himself was not in any
12  immediate danger of death or great bodily injury since the "supposed aggressors" gave
13  him a loaded gun and Petitioner was the only one armed during the robbery. *Id.* at 11-12.
14  A state court's interpretation of state law, including one announced on direct appeal of the
15  challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v.*
16  *Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988). Because
17  there was no merit in Petitioner's duress defense under state law, it cannot be said that
18  Petitioner would have obtained a different result had he testified at trial.

19         Because Petitioner has failed to show that retained counsel's performance with
20  respect to a duress defense was deficient and that he was prejudiced by it, the Court finds
21  that the state courts' rejection of this claim was not contrary to, or an unreasonable
22  application of, clearly established Supreme Court precedent, nor was it based on an
23  unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §
24  2254(d). Accordingly, Petitioner is not entitled to habeas relief on this claim.

25         2.     **Failure to Properly Advise Regarding Plea Agreement**

26         Petitioner's second claim is that retained counsel provided ineffective assistance
27  with respect to a plea offer that was made before trial.

28         The two-part test of *Strickland* applies to counsel's ineffective assistance in

1    advising a defendant to accept or reject a plea offer. *See Hill v. Lockhart*, 474 U.S. 52,

2    57-58 (1985); *Nunes v. Mueller*, 350 F.3d 1045, 1051-53 (9th Cir. 2003) (rejecting

3    attempt to limit *Hill* to acceptance of plea offer). In light of the complexity and

4    uncertainties that attend plea bargaining, it is especially essential that the habeas court

5    respect the latitude for counsel's judgment that *Strickland* requires. *See Premo v. Moore*,

6    131 S. Ct. 733, 741 (2011) (9th Circuit erred in concluding trial counsel engaged in

7    deficient performance by not moving to exclude a confession before advising client to

8    take a plea bargain early in the proceedings).

9         The first *Strickland* prong requires the petitioner to establish that counsel's advice

10   was deficient, meaning it was not "'within the range of competence demanded of

11   attorneys in criminal cases.'" *Hill*, 474 U.S. at 56 (quoting *McMann v. Richardson*, 397

12   U.S. 759, 771 (1970)). As to the second *Strickland* prong, *i.e.*, the prejudice prong, the

13   court must give the deference owed in light of the uncertainty inherent in plea

14   negotiations. *See Premo*, 131 S. Ct. at 743-44. To establish prejudice from counsel's

15   advice to reject a plea offer, petitioner must show that there is a reasonable probability

16   that, but for counsel's errors, "the plea offer would have been presented to the court...,

17   that the court would have accepted its terms, and that the conviction or sentence, or both,

18   under the offer's terms would have been less severe than under the judgment and sentence

19   that in fact were imposed." *Lafler v. Cooper*, 132 S. Ct. 1376, 1385 (2012).

20        The Court of Appeal rejected this claim on direct review:

21             Belton next contends that, if this court concludes he did not have a
          valid duress defense, his retained counsel provided ineffective assistance
22        of counsel by failing to advise him to accept an offer of a 25-year
          determinate sentence instead of proceeding to trial. We reject Belton's
23        claim of error because there is no reasonable probability he would have
          accepted the offer but for his retained counsel's purported failure to
24        properly advise him.

25        **A.    *Factual Background***

26             Before trial, the district attorney offered a plea bargain that would
          have resulted in Belton receiving a 25-year determinate sentence. Belton
27        was advised on the record that he faced up to 125 years to life in prison if
          he proceeded to trial. Despite the potential sentence he faced, Belton
28        rejected the prosecutor's offer without making a counter-offer. Retained

counsel described himself as a "trial specialist" and told Belton, "'We don't have to deal. We're going to trial.'" He also told Belton he had a valid duress defense even without Belton's testimony. Belton stated that he trusted his retained counsel and did not believe he was taking a chance by going to trial. He also said he would have used the public defender instead of hiring an attorney if he thought his only option was to accept a 25-year sentence. As he explained, his "life [was] on the line," and he did not "need a lawyer to take 25 years."

Following the jury's verdict and after his retained counsel was replaced with appointed counsel, Belton moved for a new trial on the ground that his retained counsel failed to properly evaluate the case and gave deficient advice regarding the prosecutor's plea offer. In the declaration accompanying the motion, appointed counsel stated that Belton had "requested of [retained counsel], both before trial and during trial motions in limine, to inquire from the prosecution whether they would offer something lower than 25 years; [retained counsel's] response would always be to the effect of, 'You're not taking a deal. You have a good defense. You're going to trial. I'm a trial specialist.'"

During the hearing on the new trial motion, Belton reiterated his claim that his retained counsel consistently advised him to proceed to trial because he had a valid duress defense. Belton stated that he questioned retained counsel at times as to whether he should take the 25-year offer. Belton admitted he never told his counsel or anybody else than he wanted to take the plea offer. When pressed to answer whether he was willing to take the 25-year offer, Belton responded, "I don't know. I can't say for sure that I was ever willing to do [it]."

Four days after the court heard testimony supporting the new trial motion, the court heard argument on the motion. At the outset of the hearing, the prosecutor announced that the People were prepared to agree with the proposition that Belton would have taken the 25-year determinate offer if he had been properly advised of the potential ramifications of going to trial. Consistent with the procedure outlined in *In re Alvernaz* (1992) 2 Cal.4th 924, the prosecutor agreed that Belton would be allowed to accept the 25-year offer that had been offered before trial. Belton's appointed counsel stated that he had talked to his client, who was planning to go forward with the offer. When questioned by the court, Belton stated that he understood the maximum sentence he would face if he rejected the offer and the court denied his new trial motion and proceeded directly to sentencing. [FN5] Belton understood he was giving up the right to get a new trial by accepting the offer.

> FN5. At the time, the court described the maximum sentence as 130 years to life, composed of two consecutive 40-year determinate sentences plus two consecutive 25-year indeterminate sentences.

After the court concluded its plea colloquy and asked Belton if he was willing to accept the offer, he replied, "It's a hard decision to make. I know I don't want to do that robbery. I didn't want to do it. I don't think it's fair." The court stated it would not pressure Belton into accepting the offer and moved on to consideration of the motion for new trial.

When it was the prosecutor's turn to argue the motion, she urged

that Belton's equivocal response to the renewed plea offer "100 percent disposed" of the claim that Belton was prejudiced by his counsel's purported failure to properly advise Belton about the plea offer. The prosecutor pointed out that Belton had an opportunity to talk with his appointed counsel and his wife about the offer. The prosecutor claimed there was "absolutely no way that he can prove to this Court with any certainty that he would have accepted the People's 25-year offer but for [retained counsel's] deficient advice."

The court agreed with the prosecutor and denied the new trial motion on the proffered ground that Belton's retained counsel had failed to advise him to accept an offer of a 25-year determinate sentence instead of proceeding to trial. The court stated: "I'll agree with the People the defendant cannot make a credible claim at this point that had he been properly advised he would have accepted the 25-year determinant [sic] sentence.... He's had opportunities during these proceedings, numerous opportunities to take a 25-year offer, including as recently as this morning, and he has not taken that 25-year offer. So any claim that had he been properly advised that he would have accepted the negotiated disposition must fail for an utter lack of credibility on the part of the defendant in terms of seeking and accepting the lesser offer."

During the sentencing hearing, Belton made clear that he would not have taken the 25-year offer. He told the prosecutor he appreciated being offered the 25 years again but said, "I just couldn't take it because I know in my heart that if it wasn't for me being around those dudes and whatever happened that day, I would not have committed that robbery."

### B.   *Analysis*

When an attorney's ineffective representation results in a defendant's rejection of an offered plea bargain, the defendant may assert a claim of ineffective assistance of counsel. [FN6]   (*In re Alvernaz, supra*, 2 Cal.4th at p. 934.) In order to establish ineffective assistance in connection with a rejected plea offer, a defendant must (1) "demonstrate[] that counsel's performance fell below an objective standard of reasonableness under the prevailing norms of practice," and (2) "prove there is a reasonable probability that, but for counsel's deficient performance, the defendant would have accepted the proffered plea bargain and that in turn it would have been approved by the trial court." (*Id.* at p. 937.) "[A] defendant's self-serving statement – after trial, conviction, and sentence – that with competent advice he or she *would* have accepted a proffered plea bargain, is insufficient in and of itself to sustain the defendant's burden of proof as to prejudice, and must be corroborated independently by objective evidence." (*Id.* at p. 938.)

FN6. Our review of Belton's claim of error is governed by the standard outlined in section I.B. *ante*, in which we undertake an independent review of the record to determine if the defendant's constitutional rights were violated but defer to the trial court's factual findings if supported by substantial evidence. (*People v. Taylor, supra*, 162 Cal.App.3d at pp. 724-725.)

It is unnecessary for us to consider the performance component of the analysis here because we can dispose of Belton's claim by addressing

the prejudice component. (See *In re Alvernaz*, *supra*, 2 Cal.4th at p. 945 [unnecessary to consider performance prong when there is insufficient showing of prejudice].)  The analysis in *Alvernaz* is instructive.  There, although the defendant himself stated in a declaration that in the absence of counsel's error he would have accepted the prosecution's offer, the court found no independent corroboration of that claim.  (*Id.* at pp. 945-946.)  Rather, the court found that "[t]he declarations of petitioner and his trial counsel... and the reasonable inferences drawn therefrom, establish that petitioner's decision to reject the plea offer was motivated primarily by a persistent, strong, and informed hope for exoneration at trial, and that any evaluation of precise sentencing options was secondary in his thinking."  (*Id.* at p. 945.)

In this case, Belton presents a record even less convincing than the one considered in *Alvernaz*.  Unlike the defendant in *Alvernaz*, Belton has never unequivocally stated he would have accepted the plea offer but for his counsel's purportedly inadequate advice.  Belton has pointed to no declaration or testimony in the record in which he has stated without reservation that he would have accepted the plea offer if properly advised.  Tellingly, even after being found guilty by the jury, Belton balked when offered the very same deal he rejected before trial – when he was supposedly misadvised by his retained counsel.  Indeed, Belton even clarified at sentencing – after trial and after the court had denied his new trial motion – that he could not accept the prosecution's offer because he knew in his heart that he would not have committed the robberies but "me being around those dudes and whatever happened that day."

A defendant's stance at trial may be a relevant factor in assessing prejudice.  (*In re Alvernaz*, *supra*, 2 Cal.4th at p. 940.)  For example, a defendant's protestations of complete innocence may undercut the credibility of a hindsight claim that a rejected offer would have been accepted but for counsel's mistaken or incorrect advice.  (*Ibid.*)  In addition, a defendant who fails to make a counteroffer or engage in plea negotiations may have a more difficult time claiming that he would have accepted a plea offer because it tends to show he was not amenable to a plea.  (*See id.* at pp. 938, 948.)

Here, the record reveals that Belton was not amenable to a plea bargain and was unlikely to accept one.  He did not make a counteroffer or engage in plea negotiations with the prosecution.  He was adamant in his insistence that he should not bear responsibility for his actions, because he did not want to commit the robbery and purportedly acted under duress.  Further, he felt his "life [was] on the line" and he was unwilling to accept 25 years after he had paid an attorney to get a better result than the public defendant might have achieved.  There is no corroborating evidence to support a contention that Belton would have accepted the plea but for his counsel's claimed failure to properly advise him regarding the risks of going to trial.  Rather, the available evidence supports the conclusion that Belton was inclined to reject the plea regardless of his counsel's advice.

Belton claims he "was not advised at any point in the proceedings as to the tenuous nature of his duress defense" and that the alleged error was compounded when the renewed plea offer was made "in the midst of a court hearing, without benefit of consultation with counsel."  The suggestion is that his appointed counsel repeated the errors of his retained

1    counsel and that Belton was not given adequate time to consider the
     renewed plea offer. The record belies Belton's contentions.
2

3        The record makes clear that the prosecutor had discussed the
     renewed plea offer with Belton's appointed counsel, who had in turn
     discussed the offer with Belton. Belton had also been given the
4    opportunity to talk with his wife about the offer. Thus, he had adequate
     time to consider the offer. In any event, if his claim is that he would have
5    accepted the pretrial offer but for retained counsel's incompetent advice,
     there should have been no reason to equivocate and nothing that required
6    extensive time to consider. Moreover, his appointed counsel understood
     the difficulties with Belton's claimed defense, going so far as to say in the
7    motion for a new trial that Belton had no duress defense. After being
     found guilty by a jury and having his proposed duress defense subjected to
8    scrutiny in the context of the new trial motion. Belton plainly understood
     the tenuous nature of his defense at that point.
9

10       Accordingly, we conclude that Belton's ineffective assistance claim
     fails because there is no reasonable probability he would have accepted the
11   prosecution's plea offer but for his retained counsel's purportedly
     ineffective representation.

12   (Op. at 15-20.)

13       Assuming that retained counsel's advice to reject the plea offer was objectively

14   unreasonable, Petitioner fails to show that he was prejudiced by it. *See Strickland*, 466

15   U.S. at 697. The state appellate court conducted a thorough review of the record to

16   determine what transpired with respect to the plea offer. The record shows that even after

17   Petitioner's retained counsel was replaced with appointed counsel, Petitioner gave

18   equivocal responses when asked whether he was willing to accept the plea offer: "I can't

19   say for sure that I was ever willing to do [it]"; and "It's a hard decision to make... I don't

20   think it's fair." *See supra* at 17. Later during the sentencing hearing, Petitioner stated

21   clearly that he did not want to take the offer: "I just couldn't take it because I know in my

22   heart that it wasn't for me being around those dudes and whatever happened that day, I

23   would not have committed that robbery." *Id.* at 18. When the prosecution gave Petitioner

24   another opportunity to accept the plea offer during arguments for his new trial motion ,

25   Petitioner declined to do so after he had discussed the renewed offer with appointed

26   counsel and his wife. *Id.* at 19-20. As the trial court phrased it, there was an "utter lack

27   of credibility" on the part of Petitioner, and the state appellate court reasonably concluded

28   that Petitioner's behavior indicated that he was inclined to reject the plea offer regardless

1   of counsel's advice. *Id.* at 19. Based on this record, Petitioner has failed to show that the

2   result of the proceeding would have been different but for retained counsel's allegedly

3   deficient advice. *See Strickland*, 466 U.S. at 694. Accordingly, the state court's rejection

4   of this claim was not contrary to, or an unreasonable application of, clearly established

5   Supreme Court precedent, nor was it based on an unreasonable determination of the facts

6   in light of the evidence presented. 28 U.S.C. § 2254(d). Petitioner is not entitled to

7   federal habeas relief on this claim.

8

9                                    **CONCLUSION**

10          For the reasons set forth above, the petition for writ of habeas corpus is **DENIED**.

11          The federal rules governing habeas cases brought by state prisoners require a

12   district court that denies a habeas petition to grant or deny a certificate of appealability

13   ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

14   2254. Petitioner has not shown "that jurists of reason would find it debatable whether the

15   petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*,

16   529 U.S. 473, 484 (2000). Accordingly, a COA is **DENIED**.

17          The Clerk shall close the file.

18          **IT IS SO ORDERED.**

19

20   DATED: _____

21                                    BETH LABSON FREEMAN
                                      United States District Judge

22

23

24

25

26

27

28